Filed 1/28/26  P. v. Ellis CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>KATHRYN ANN ELLIS,<br><br>    Defendant and Appellant. | F089056<br><br>(Super. Ct. No. F12907460)<br><br>**OPINION** |

-ooOoo-

### THE COURT[*]

APPEAL from an order of the Superior Court of Fresno County.  F. Brian Alvarez, Judge.

Michelle T. LiVecchi-Raufi, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the State Attorney General, Sacramento, California, for Plaintiff and Respondent.

-ooOoo-

---

[*]    Before Hill, P. J., Levy, J. and Snauffer, J.

# **INTRODUCTION**

In 2013, appellant and defendant Kathryn Ann Ellis (defendant) was convicted after a jury trial of the premeditated first degree murder of her husband, Robert Wayne Ellis. The jury found true the financial benefit special circumstance and that she personally discharged a firearm causing death. Defendant was sentenced to life in prison without possibility of parole (LWOP) for murder with the special circumstance, plus 25 years for the firearm enhancement. She filed a direct appeal but dismissed it on her own motion.

In 2024, defendant filed a petition in the trial court pursuant to Penal Code[1] section 1172.6 for resentencing of her first degree murder conviction. The court denied the petition for failing to state a prima facie case because the record of conviction showed the jury was not instructed on any now-invalid imputed malice theories.

In this appeal from the denial of her section 1172.6 petition, appellate counsel filed a brief with this court pursuant to *People v. Delgadillo* (2022) 14 Cal.5th 216 and *People v. Wende* (1979) 25 Cal.3d 436, which summarized the facts and procedural history with citations to the record, raised no issues, and asked this court to independently review the record. Defendant filed a lengthy supplemental letter brief.

After independent review of the record and the contentions raised in defendant's letter brief, we affirm.

---

[1]     All further statutory citations are to the Penal Code.

2.

# FACTS[2]

Defendant and her husband Robert Wayne Ellis (Ellis) lived in a residence in Kingsburg with their teenage child. Ellis worked at California Engineering and Manufacturing Company. Defendant did not work outside the home.

On the evening of September 19, 2012, defendant called 911 and said she needed help because "someone's broken in and my husband's been shot." The dispatcher asked if she knew who shot him. Defendant said she "never saw anybody."

The first dispatcher patched the call through to an EMS dispatcher, who asked defendant where it happened. Defendant said: "Ah in our home. Um, we were, we were back on the bed and, just watching TV, my husband thought he heard something—and we have a gun—he got the gun—and he told me, he told me to stay in the room—and so I did—and he came out and I heard just some noise and then I heard the shots go off."

In response to the dispatcher's questions, defendant said her husband was on the couch, he was bleeding, he was shot in the chest, and she did not know what happened.

> "[Dispatcher]: Okay so somebody shot him or did he accidentally shoot himself?
>
> "[Defendant]: No, somebody shot him."

The dispatcher instructed defendant to put pressure on the wound with a towel, and asked if he had only one wound. Defendant said she did not know, but "the gun went

**2** After notice to the parties and without objection, this court takes judicial notice of the entirety of the records before this court, including the appellate briefing, filed in defendant's nonpublished order *People v. Kathryn Ann Ellis* (Sept. 4, 2015, F068127).

The following factual summary is from the transcript of defendant's jury trial. It is included for the limited purpose of giving context to the issues raised in defendant's letter brief. This summary does not include the entirety of the evidence introduced at defendant's jury trial and will not be relied upon to address the trial court's denial of defendant's section 1172.6 petition.

off a whole bunch of times so I wouldn't think so." The dispatcher asked if he was breathing. Defendant said, "[N]o, no, he's dead, I know he's dead." The dispatcher instructed defendant to put him on the floor, flat on his back. Defendant said he was dead, and she could not lift him because he was too big.

**First Officer at the Scene**

At 7:55 p.m., Officer Rick Mejia of the Kingsburg Police Department was the first officer to arrive at the residence. Defendant was standing in front of the house at the curb. Mejia asked where Ellis was, and she pointed to the open garage door, which led to a door into the house. Defendant's clothes were clean and there was no blood on her.

Mejia ran into the house, and found Ellis lying face-up on his back on the living room couch. His eyeglasses were correctly placed on his face and were not askew. Ellis's right arm was lying across his body, just below his chest, and his left arm was at his side. Ellis had a visible gunshot wound to the chest. Ellis was not breathing and did not have a pulse.

Mejia tried to move Ellis from the couch to the floor to perform CPR, but needed a second officer's help because of Ellis's size.[3] The two officers moved Ellis to the floor. Mejia performed CPR compressions on him and got a lot of blood on his arm.

Emergency medical personnel arrived and took over from Mejia. The EMTs determined Ellis was not breathing and did not have a pulse. They continued to administer CPR for another eight to 10 minutes with no results, and then pronounced Ellis dead.

**The Scene**

No one else was in the house when the officers arrived. There were no signs of a physical struggle or disturbance in the house, and nothing had been taken.

---

[3]     Ellis was six feet tall and weighed 259 pounds.

4.

There was blood on the living room couch, the couch's cushions and throw pillow, and the adjacent carpet where Ellis had been moved to the floor. There was no blood anywhere else in the house. A blanket was neatly folded and lying straight across the back of the couch, and there was no blood on it.

The waterbed in the master bedroom was neatly made, the top sheets were not disturbed, and it appeared as if no one had sat or lied down on it.

The televisions were on in both the living room and master bedroom. The EMTs slightly moved the couch and turned off the living room television while they worked on Ellis.

## The Gunshot Wounds

The pathologist testified Ellis died as a result of gunshot wounds that perforated his heart and lungs and caused massive internal bleeding.

Ellis suffered four gunshot entry wounds, and was shot three or four times. The pathologist could not determine the shot sequence, and identified the entry wounds as wounds A, B, C, and D.

Wound A entered the left front side of Ellis's chest near the shoulder. Wound A was a contact wound because there were soot depositions at the margins, which suggested the gun was fired while the muzzle was touching Ellis's clothing. This bullet went through the upper left lobe of his lung. The path of the bullet was front to back.

Wound A would have caused blood to spatter. There was blood spatter on the left side of Ellis's face but none on the right side. The pathologist testified Ellis would have survived wound A if he received appropriate treatment.

Wound B was the fatal wound and caused significant bleeding, and immediate death occurred within four to seven minutes. The bullet's entry point for wound B was the front left side of Ellis's chest near the breast. This bullet went through the right ventricle of the heart and lower lobe of the right lung, and exited toward Ellis's back right

side.  The bullet traveled from left to right, and very slightly front to back.  This was not a contact wound.

The bullet for wound C entered Ellis's body near the center line.  It was a graze wound that traveled under the skin, did not enter the chest cavity, and exited on the right side of his chest, close to the right nipple.  It was not a contact wound.

Wound D was an entry wound in the inside of Ellis's right arm, and the bullet lodged in his arm.  Wound D could have been caused by a separate gun shot.  It also could have been a re-entry wound because it corresponded to wound C's exit wound.

The pathologist testified Ellis suffered internal bleeding that resulted in significant pooling of blood on the right internal side of his chest, consist with Ellis lying on his right side.  Based on the internal bleeding and blood spatter on the left side of Ellis's face, the pathologist believed Ellis could have been lying on his right side on the couch when he was shot.

## Defendant's Statements at the Scene

Detectives Dewayne Chatman and Sergio Toscano jointly interviewed defendant that night, while they were seated in a police car parked by her residence.  Defendant said that sometime around 4:45 p.m. to 5:00 p.m., she left the house to drive their teenage son to his school for an event, and he was supposed to return home around 9:00 p.m. or 9:30 p.m.  As defendant and their son were leaving their house, Ellis arrived home.  After taking their son to the school, defendant drove home, and then left again to buy take-out food for dinner.  Defendant and Ellis ate dinner in the living room, they watched "The Big Bang Theory" on the living room television from 7:00 p.m. to 7:30 p.m., and she cleaned up the kitchen and threw out the garbage in their trash cans in the back alley.

Defendant said the next episode of "The Big Bang Theory" aired from 7:30 p.m. to 8:00 p.m., and defendant and Ellis decided to watch it on the master bedroom's

television.  Defendant said they sat on top of the sheets of their waterbed in the master bedroom and watched the program.[4]

Defendant said that close to 8:00 p.m., toward the end of the second episode of "The Big Bang Theory," she started to hear noises at the house's doggie door, as if the flaps were opening.  Defendant told Ellis that someone had to check it out.  Defendant said Ellis retrieved her gun, a Smith & Wesson .38-caliber special.  Defendant had owned it for about 15 years.  Ellis told defendant to go into the bathroom with their dog and close the door.

Defendant said Ellis took the gun, left the master bedroom, and walked down the hallway.  When she was inside the bathroom, she heard Ellis say, " 'Hey,' " followed by three or four gunshots.  She did not hear yelling or a struggle.  Defendant left the bathroom, walked out, and did not see anyone leaving the house.

Defendant said she found Ellis lying on the living room couch and called 911.  She placed a towel on his gunshot wounds as instructed by the dispatcher, panicked, and went outside.

As the interview continued, Chatman again asked defendant what she did after she found Ellis on the couch.  Defendant said she checked him for breathing and then performed chest compressions.  Chatman asked if she raised Ellis's shirt to check for wounds, and defendant said no.

Chatman asked defendant if Ellis was familiar with guns.  Defendant said he used to be a hunter in his teens and twenties, and they still go hunting.  Chatman asked if they

---

[4]     The prosecution introduced evidence that on September 19, 2012, KMPH channel 26 broadcast "The Big Bang Theory" from 7:00 p.m. to 8:00 p.m., followed by "The X Factor" from 8:00 p.m. to 10:00 p.m.

When the officers arrived, the television in the master bedroom was still on and tuned to Channel 47.  On September 19, 2012, Channel 47 broadcast "The Insider" from 7:00 p.m. to 7:30 p.m., "Entertainment Tonight" from 7:30 p.m. to 8:00 p.m., and "Comics Unleashed" starting at 2:07 a.m., on September 20, 2012.

7.

had any financial issues. Defendant replied, " 'Well, I imagine everyone has some, you know….' " Chatman asked if Ellis was suicidal. She said no.

Chatman asked if Ellis had life insurance. Defendant said they had insurance through Ellis's work that was $100,000 for Ellis and $50,000 for her. Defendant said they got the policy in 2007, and it was a "good thing that they did because her husband had a heart attack around about 2008." Defendant did not say that she had recently inquired about increasing the amount of Ellis's life insurance policy.

Chatman asked defendant if she had any problems with Ellis, if he did anything for this to happen, or if the shooting was an accident. Defendant said no, and denied having anything to do with Ellis being shot.

Defendant was asked why they did not call the police if they thought an intruder was in the house. Defendant said there were no telephones "in the back part of the house." Defendant was asked why she did not use the telephone in the master bedroom, and she said there was not one there. However, the detectives determined there was a cell phone in the master bedroom and a telephone in a bedroom office.

After this interview ended, defendant waited at the scene so she could get her dog from inside the residence and go to her mother's house, but officers were still conducting the investigation inside the house. She kept checking with Chatman about whether they were done so she could go inside.

Chatman wanted to ask defendant more questions based on his review of the scene. When defendant next asked if she could get the dog and leave, Chatman said he wanted to talk to her again. Defendant said she did not want to answer any more questions, she was tired, and she wanted to go to her mother's house to be with her family.

**The Firearm**

On the night of the homicide, defendant's hands were tested for gunshot residue. The results showed gunshot residue on both of defendant's hands. Ellis also had gunshot

8.

residue on both hands, which could have been consistent with being shot multiple times, including once at close range, while lying on the couch. The criminalist testified that the gunshot residue on defendant's hands could have been consistent with either firing the weapon or when she touched his body.

The officers obtained a search warrant and emptied the contents of the Ellis's trash cans. A firearm fell out in the midst of the garbage, and it had not been on top of the trash. The weapon was a .38-caliber Smith & Wesson Model 60 revolver with a two-inch barrel. This type of firearm would not eject the casings. The revolver was registered to defendant, and it contained five expended shell casings.

An expended and flattened bullet, consistent with hitting a hard surface, was found at the base of the television in the living room.

The bullets recovered from Ellis's body and found at the scene were fired from defendant's Smith & Wesson revolver.

Both defendant and Ellis were familiar with firearms. A few days before the homicide, defendant and Ellis went to a shooting range with their son and his friend, and defendant's mother.

**Arrest of Defendant**

Around 1:00 p.m. on September 20, 2012, Chatman and Toscano arrived at the house of defendant's mother to ask defendant more questions. Defendant's mother invited them in, and said defendant and her son were sleeping and could not meet with them. Toscano separately spoke with defendant's mother in another room, and asked what happened between defendant and Ellis. Defendant's mother left the room, went back to Chatman, and told him in an aggressive tone, " 'Don't you do anything.' " The mother got on the telephone and made several calls.

Defendant entered the living room. She was very concerned and wanted to know why the detectives were there. Chatman testified defendant wanted to know "what was going to happen to her is what she kept saying. She said that she was full of anxiety, and

9.

she was physically shaking that I could see. I could see at one point that she was crying and sobbing to the point to where she was face down in the living room on the floor. Her mother … at one point had brought her a blanket so that she can wrap herself into a blanket. [Defendant] said that she felt like she was bursting at the seams." Defendant never mentioned Ellis and she "was only concerned as to what was going to happen to her and what was going to happen to her son."

Toscano testified they arrested defendant that day. After defendant was placed in their squad car, a woman drove up to the mother's house, and this person was later identified as "Maggie."

## Financial Evidence

The prosecution introduced extensive evidence that defendant and Ellis had financial problems at the time of the murder.

There was also evidence that in the late summer of 2012, defendant contacted the insurance agent who issued Ellis's life insurance policy through his employer. Defendant was the beneficiary. Defendant asked the agent about the life insurance policy, and the agent explained it was for $100,000 and double that amount if there was an accidental death. Defendant asked the agent if she could increase the policy amount, and said she did not want Ellis to know about it because he had "mortality issues and didn't want to deal with it," and he left everything "up to her."

In August 2012, defendant contacted the financial advisor who previously set up an IRA for Ellis. Defendant asked for the balance of Ellis's IRA account and how they could access the money. The advisor explained he was working for a different financial institution, and Ellis had to request the information directly from the original financial institution. Defendant asked if she could get life insurance on Ellis without having a medical underwriting examination "due to his health concerns." About two weeks later, the financial advisor called defendant and gave quotes on various life insurance policies, and defendant said to email the information to her. Defendant told the agent that

10.

insurance "was a touchy subject" for Ellis, and she was concerned that Ellis might be upset that she was trying to find life insurance for him. The financial advisor said he needed to speak with Ellis. He emailed the information to defendant and did not hear back from her. When the financial advisor saw the television news report about the murder of Ellis, he called law enforcement and reported his conversations with defendant.

Shortly before the murder, defendant instructed their teenage son to call a financial institution, claim he was Ellis, and say he wanted to access certain funds. The son followed her instructions, but he did not understand what defendant was doing or why she told him to do that.

**Defendant's Recorded Jail Calls**

Defendant was held in jail while awaiting trial. During a recorded call that defendant placed to her mother from jail, the mother said she wanted to talk to Margaret Mims (the Sheriff of Fresno County) and tell her to let defendant come home since other "scums" were being released. Defendant agreed that she should be released because she was not a flight risk. Defendant's mother said she would talk to defendant's trial counsel. Defendant replied: "I'm not a risk of *doing anything again*, or I mean, I mean, just put an ankle monitor on me and let me go home and I'll show up to every court on time, I mean." (Italics added.)

The prosecution introduced evidence about another recorded call from jail between defendant and her mother. During this call, defendant's mother told defendant that she "talked to Magi tonight finally" who was "there that day," and "Magi" said "I want you to know, that all of the happenings that day and all of our conversations I am considered . . . part of legal advice and she said so everything between you and I is confidential and she goes and nobody could ever ask me to repeat anything I ever said to you and I said okay thank you."

**Defendant's Trial Testimony**

At trial, defendant testified and said she made the calls to the financial advisors at Ellis's direction and with his consent, including the call she told her son to make. When checks from these institutions arrived at the house, defendant signed Ellis's name with his consent and deposited the money into their joint account. Defendant admitted that a few years ago, she withdrew money from her son's bank account without his knowledge or consent, she used the money to pay for the son's birthday presents, and she never repaid the money into that account.

Defendant testified that on the night of the homicide, she picked up food and ate dinner with Ellis in the living room. They watched the end of the television news, and then switched to "The Big Bang Theory" at 7:00 p.m., broadcast on a local channel. After dinner, she threw out the garbage in their trash can in the back alley.

Defendant and Ellis left on the television in the living room, went into the master bedroom, laid down on top of the sheets on their waterbed, and watched the 7:30 p.m., episode of "The Big Bang Theory" on the bedroom television. Defendant testified Ellis had the remote control and he usually switched channels during commercial breaks, and then switched back to the episode. Defendant could not explain why the channel on the bedroom television was left on local Channel 47 that did not broadcast "The Big Bang Theory." She thought Ellis was probably channel surfing.

Defendant testified while they were watching television, they heard "a rattling sound" from "the doggy door" in the back, but their dog was in the master bedroom with them. Defendant was not sure if they heard the noise when Ellis had switched channels or they were still watching the episode. Defendant testified the noise "bothered him enough" to say that he was going to check on it. They got off the bed on defendant's side, and Ellis said he wanted defendant's .38-caliber gun. Defendant testified she had the gun for about 25 years. The gun held five rounds when fully loaded, but she only kept four rounds in the weapon. Ellis loaded the fifth chamber so it was fully loaded that

12.

night. Ellis told defendant to take their dog into the bathroom and lock the door while he checked. Defendant admitted that she did not previously tell the detectives that Ellis loaded a fifth round into the revolver.

Defendant testified that when she retrieved the gun for Ellis, she got off the waterbed and straightened out the top comforter they had been sitting on, because she was "a little bit OCD or overly tidy." In her prior statement to the detectives, she did not mention that she straightened the bed covering because she did not think it was important.

Defendant testified they did not call the police because there was no telephone in the master bedroom, and the "first available . . . cordless phone" was in the office, which was halfway up the hallway. Defendant later discovered that Ellis left his cell phone in the bedroom but she did not know that at the time, and thought he took it with him. Defendant also testified they did not think "there was somebody out there," a neighbor's dog probably got into their yard, and Ellis took the gun in case it was an unfriendly big dog.

Defendant testified that while she waited in the bathroom, she thought Ellis said something like "Hey," and then heard three to four gunshots. She was not sure if the shots sounded like they were fired from her revolver. She did not hear yelling or sounds of a struggle.

Defendant left the bathroom, looked into the living room, called for Ellis, and saw him lying on the couch. He was lying on his back and facing up, and there was blood on his chest. She grabbed the cordless telephone in the kitchen and called 911. She followed the dispatcher's instructions and put a towel on his chest wound. She pushed on his chest and touched his neck, and realized he did not have a pulse and was not breathing. She did not touch the parts of his body where there was blood. The dispatcher told her the police were on the way, and she went outside to open the garage door for them.

13.

Defendant testified that when she put the towel on Ellis's chest, she was standing on the backside of the couch, and leaned over the area where the blanket was folded to do so. She placed her hands on both of Ellis's cheeks, and then to his nose area, to check for breathing and a pulse. She did not put pressure on the chest wound and it was not bleeding.

> "[DEFENSE COUNSEL:] Okay. Was this an accident? What happened to [Ellis]? You know, were you involved in some type of gun accident with [Ellis]?
>
> "[DEFENDANT:] No.
>
> "[DEFENSE COUNSEL:] No?
>
> "[DEFENDANT:] No.
>
> "[DEFENSE COUNSEL:] Did you shoot and kill your husband?
>
> "[DEFENDANT:] I did not. I would not.
>
> "[DEFENSE COUNSEL:] Did you, you know, use your firearm and throw it in your trash can?
>
> "[DEFENDANT:] No. No."

Defendant did not know how her revolver ended up in the trash can. She did not shoot and kill Ellis to get the insurance money because of their financial situation.

Defendant was asked about her recorded call from jail with her mother, when she said that she would not do anything "again" if she was released from custody. Defendant testified that she was talking about being released on an ankle monitor, that she would not do anything that would violate being released on an ankle monitor and "I wouldn't go out and about."

Defendant was asked about another recorded call from jail to her mother, when her mother said she "finally" talked to Maggie who said she would not repeat anything that she saw or heard that day. Defendant testified that as she was being arrested and taken away from her mother's house, she saw Maggie arrive there. Defendant testified Maggie

14.

was her mother's close friend, this person "is also an attorney, and mom had called Magg[ie] for assistance" when the detectives arrived. Defendant testified that her mother told her that she thanked "Magg[ie]" for being "there for her and helped her" through the situation.

## PROCEDURAL BACKGROUND

On December 7, 2012, an information was filed in the Superior Court of Fresno County charging defendant with first degree premeditated murder (§§ 187, subd. (a), 189), with the special circumstance that the murder was committed for financial gain (§ 190.2, subd. (a)(1)); and the enhancement that defendant personally and intentionally discharged a firearm which proximately caused death (§ 12022.53, subd. (d)).

On August 1, 2013, defendant's jury trial began.

On August 21, 2013, defendant was convicted of first degree murder, and the jury found true the financial gain special circumstance and personal discharge enhancement.

On September 25, 2013, the trial court denied defendant's motion for a new trial and conducted the sentencing hearing. The court heard statements from members of Ellis's family, who expressed their grief at his murder and urged the court to sentence defendant to the maximum term. Defendant addressed the court and again denied that she killed Ellis.

The trial court found the evidence was very strong and defendant's explanation for his death "simply did not match the evidence, and it did not make sense. It made no sense that Bob Ellis would have left his room, where there was a cell phone, and confronted an intruder with a firearm that he's skilled at and capable of using, and then he would have somehow put himself in a position where that person could take that gun from him without even having fired a shot, and then shot and killed him in a position where he was found."

The trial court sentenced defendant to LWOP plus 25 years to life for the personal discharge enhancement.

15.

**Direct Appeal**

Defendant filed a timely notice of appeal. The entirety of the record was filed with this court, appellate counsel was appointed, and the appeal was fully briefed by the parties. In her appellate brief, defendant asserted the trial court committed evidentiary and instructional errors, and the suspended parole revocation fine must be stricken since defendant was sentenced to LWOP. The People agreed the suspended fine should be stricken and argued defendant's other contentions lacked merit.

On September 4, 2015, however, defendant filed a letter with this court that she personally signed, stating that "after having communicated with counsel about the matter, [she] hereby abandons her appeal and requests an order for its dismissal." On the same day, this court filed an order granting defendant's request and dismissed her direct appeal.

**Habeas Petitions**

According to defendant's letter brief filed in this appeal, she subsequently filed writ petitions in the superior court, California Supreme Court, and federal court while represented by counsel, and the petitions were denied.

## SECTION 1172.6 PETITION

On September 18, 2024, defendant filed a petition in the trial court for resentencing of her first degree murder conviction and LWOP sentence pursuant to section 1172.6, subdivision (a), and requested appointment of counsel.

Defendant's supporting declaration consisted of a preprinted form where she checked boxes that stated (1) a complaint, information, or indictment was filed against her that allowed the prosecution to proceed under a theory of felony murder, murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, or attempted murder under the natural and probable consequences doctrine; (2) she was convicted of murder, attempted murder, or manslaughter following a trial, or accepted a plea offer in

16.

lieu of a trial at which she could have been convicted of murder or attempted murder; and (3) she could not presently be convicted of murder or attempted murder because of changes made to sections 188 and 189, effective January 1, 2019. On October 9, 2024, the trial court appointed counsel.

On October 11, 2024, defendant's counsel filed a brief with the trial court, and asserted that her petition was facially valid and she was entitled to an evidentiary hearing.

On November 18, 2024, the People filed opposition supported by the jury instructions and the verdict forms from defendant's trial. The People argued defendant was ineligible for resentencing because the jury was not instructed on any imputed malice theories that were now invalid.

**The Trial Court's Denial of the Petition**

On December 4, 2024, the trial court conducted a hearing on defendant's petition. Defendant's counsel was present and defendant appeared by videoconference. The court stated it had reviewed the pleadings, and invited arguments.

Defendant's counsel stated defendant filed a facially-valid petition that established a prima facie case, and an order to show cause should be issued for an evidentiary hearing. Counsel agreed the trial court could review the record of conviction to make the prima facie determination but it could not weigh the evidence. The district attorney submitted on the opposition pleading.

The trial court held the record of conviction, consisting of the jury instructions and verdict forms, refuted defendant's petition. "[T]he instructions given to [defendant's] jury show that the jury was not charged with considering whether she aided or abetted a principal, nor was any instruction given on natural and probable consequences or for felony murder, or any other theory where malice might be imputed to her," and defendant was convicted of first degree murder on a finding that she personally committed willful, premeditated and deliberate murder. The court denied defendant's petition for failing to state a prima facie case.

17.

On December 13, 2024, defendant filed a timely notice of appeal.

## DISCUSSION

As noted above, appellate counsel filed a brief with this court pursuant to *Wende* and *Delgadillo*.  The brief also included counsel's declaration that defendant was advised she could file her own brief with this court.  This court advised defendant by letter that she could file a supplemental letter or brief raising any arguable issues.  Defendant filed a lengthy letter brief and raises several issues.

### I.  Section 1172.6

We begin with the trial court's denial of defendant's section 1172.6 petition for resentencing.

"Effective January 1, 2019, Senate Bill No. 1437 (2017−2018 Reg. Sess.) amended the felony-murder rule by adding section 189, subdivision (e).  [Citation.]  It provides that a participant in the qualifying felony is liable for felony murder only if the person:  (1) was the actual killer; (2) was not the actual killer but, with the intent to kill, acted as a direct aider and abettor; or (3) was a major participant in the underlying felony and acted with reckless indifference to human life.  [Citation.]  The Legislature also amended the natural and probable consequences doctrine by adding subdivision (a)(3) to section 188, which states that '[m]alice shall not be imputed to a person based solely on his or her participation in a crime.' "  (*People v. Harden* (2022) 81 Cal.App.5th 45, 50–51; *People v. Strong* (2022) 13 Cal.5th 698, 707–708; *People v. Reyes* (2023) 97 Cal.App.5th 292, 295.)

Effective January 1, 2022, Senate Bill No. 775 (2020–2021 Reg. Sess.) amended former section 1170.95 in several respects, codified the holding in *People v. Lewis* (2021) 11 Cal.5th 952 (*Lewis*), and clarified that, in some circumstances, the same relief available to petitioners convicted of murder is also available to petitioners convicted of attempted murder or manslaughter, and addressed various aspects of the petition procedure including the petitioner's right to counsel, the standard for determining the

18.

existence of a prima facie case, the burden of proof at the hearing to determine whether a petitioner is entitled to relief, and the evidence a trial court may consider at that hearing. (*People v. Birdsall* (2022) 77 Cal.App.5th 859, 865 & fn. 18; *People v. Hurtado* (2023) 89 Cal.App.5th 887, 892.)  Former section 1170.95 was subsequently renumbered as section 1172.6 without further changes.  (*People v. Curiel* (2023) 15 Cal.5th 433, 449.) Section 1172.6, subdivision (a) thus states a person may file a petition for resentencing if "convicted of felony murder or murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, attempted murder under the natural and probable consequences doctrine, or manslaughter . . . ."

The petitioner must declare:  "(1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder, murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, or attempted murder under the natural and probable consequences doctrine.  [¶]  (2) The petitioner was convicted of murder, attempted murder, or manslaughter following a trial or accepted a plea offer in lieu of a trial at which the petitioner could have been convicted of murder or attempted murder.  [¶] (3) The petitioner could not presently be convicted of murder or attempted murder because of changes to Section 188 or 189 made effective January 1, 2019."  (§ 1172.6, subd. (a)(1)–(3); *People v. Patton* (2025) 17 Cal.5th 549, 558.)

"[W]hen a petitioner files a facially sufficient petition, the trial court must appoint counsel to represent the petitioner.  The trial court may consider the record of conviction to determine whether the petitioner makes a prima facie showing only after the appointment of counsel and the opportunity for briefing has occurred." (*People v. Reyes*, *supra*, 97 Cal.App.5th at p. 298; *People v. Patton*, *supra*, 17 Cal.5th at p. 559.)

In making the prima facie determination, the court "may look at the record of conviction . . . to determine whether a petitioner has made a prima facie" showing. (*Lewis*, *supra*, 11 Cal.5th at p. 971.)  " '[T]he record of conviction will necessarily inform the trial court's prima facie inquiry . . . , allowing the court to distinguish petitions with potential merit from those that are clearly meritless.' " (*People v. Antonelli* (2025) 17 Cal.5th 719, 731.)  The charging documents, jury instructions, and verdict forms are part of the record of conviction and may be reviewed to make the prima facie determination. (*People v. Lovejoy* (2024) 101 Cal.App.5th 860, 865; *People v. Harden*, *supra*, 81 Cal.App.5th at p. 56.)

The trial court may deny a section 1172.6 petition for failing to state a prima facie case if the petitioner is ineligible for resentencing as a matter of law.  (*Lewis*, *supra*, 11 Cal.5th at p. 966.)  We review de novo whether the court properly made the prima facie determination.  (*People v. Williams* (2022) 86 Cal.App.5th 1244, 1251.)

*Analysis*

The trial court herein complied with section 1172.6 upon receipt of defendant's petition by appointing counsel, providing for further briefing, conducting a hearing on the petition, and giving reasons for finding defendant's petition did not state a prima facie case and she was ineligible for resentencing as a matter of law.  The court relied on the jury instructions and verdict forms, and did not make any factual findings.  (§ 1172.6, subds. (b), (c).)

The trial court correctly found defendant failed to state a prima facie case for resentencing because the record of conviction shows she is ineligible for resentencing as a matter of law.  Defendant was the only person charged in the information with the murder of her husband.  The jury was instructed with CALCRIM Nos. 520 and 521, on first and second degree murder, express and implied malice, and premeditation, deliberation, and willfulness.  The jury received CALCRIM No. 730 on the definition and

elements of the financial gain special circumstance, and CALCRIM No. 3150 on the section 12022.53 personal discharge enhancement.

The jury was not instructed on principals and accomplices, aiding and abetting, the natural and probable consequences doctrine, target and nontarget offenses, the felony-murder rule, or any other theory of imputed malice that is now invalid. Defendant was convicted of first degree murder, with the special circumstance.

The record of conviction thus establishes that defendant was convicted as the actual killer who acted with premeditation and the intent to kill. Her conviction was not based on any theory of imputed malice that is now invalid under section 1172.6.

## II. Defendant's Letter Brief

In her letter brief, defendant does not raise any issues relevant to the trial court's denial of her section 1172.6 petition for resentencing. Instead, she requests this court "to address other appealable issues" because "I'm actually innocent of the first-degree murder" of Ellis, and "this issue was never addressed by any court following my conviction."

Defendant states she lied at her jury trial when she testified that an intruder entered the house and shot and killed Ellis, and she did not murder him "in cold blood for financial gain." Defendant claims she "interrupted [Ellis] trying to kill himself and then we struggled for the gun. It was during that struggle that [he] died."

Defendant states she was not truthful with her trial counsel about what happened because she felt shame and guilt that her husband was trying to kill himself. She wanted to protect their teenage child from the truth, and she "was too ashamed for [his] attempted suicide to come to light."

Defendant states her trial counsel did not believe "the intruder story," but he "drew that story from me on direct examination question by question . . . and then didn't mention it again during his closing argument." Defendant claims trial counsel argued in closing that "the attempted-suicide-struggle-for-the-gun theory was a plausible alternative

21.

to the prosecution theory of cold-blooded murder. I had no idea he was going to do that. While [trial counsel] was correct in his assessment about what happened, the problem is he neither presented nor developed any evidence supporting it."

Defendant stated they had financial problems and Ellis had health issues, he was depressed, he had suicidal tendencies, and he was under psychiatric observation at the time of his death. On that evening, defendant said they ate dinner in the living room and watched television. She went outside to throw out the trash after dinner. Ellis was lying on the couch and continued to watch television. When she returned to the living room, she "heard the click of [Ellis] pulling back the hammer of a revolver we kept in the house. I ran to and reached him just before or as the first shot was fired. (I came up to him from behind the couch, which was facing the fireplace and TV; the back of the couch was not against a wall, but rather faced the hallway from the bedrooms.) During the struggle, another 3 shots were fired, all going in different angles in the other direction (toward the TV). He was mortally wounded."

Defendant states she had filed habeas petitions in state and federal court, and that her habeas attorney "pointed out" that trial counsel "tried to draw the truth out of me by having my mother write me a letter telling me I should tell him the truth about [Ellis's] death and that no matter what, she would still love me." Defendant's habeas attorney also "submitted evidence from both a forensic pathologist and a forensic psychologist supporting the attempted suicide and subsequent struggle for the gun theory."

Defendant admits that after she realized her husband was fatally wounded, she threw the gun away in the trash can behind her house. She claims that after her conviction, she saw a psychologist who attributed this conduct to "Acute Stress Disorder from the entire incident" and blamed herself, which is why she made up the story that an intruder killed her husband.

Defendant states none of this evidence was introduced at her jury trial, and blames trial counsel for failing "to develop or present any evidence to support it as was done on habeas."

> "Unfortunately, the evidence my habeas attorney developed was never considered on habeas by any reasoned opinion. The Superior Court denied my second habeas petition (where this evidence was first developed) as successive, the [Attorney General] argued the same as to the habeas petition before the California Supreme Court, while a different [Attorney General] from the same office argued on federal habeas that my attorney blew the statute [of] limitations. Although equitable tolling was argued, it was never addressed by the [United States] district court. The [Ninth] Circuit denied a certificate of appealability without comment."

Defendant requested this court "institute proceedings where these facts can be properly addressed and considered." She again acknowledged she committed felony perjury at trial, but she had already been in custody for almost 13 years.

### *Analysis*

In her letter brief, defendant acknowledges she voluntarily dismissed her direct appeal, and that her writ petitions filed in state and federal court were denied. Defendant cannot raise these claims in this appeal from the denial of her section 1172.6 petition for resentencing.

"Section 1172.6 does not create a right to a second appeal, and [a petitioner] cannot use it to resurrect a claim that should have been raised in [the] . . . direct appeal." (*People v. Burns* (2023) 95 Cal.App.5th 862, 865.) "The mere filing of a section [1172.6] petition does not afford the petitioner a new opportunity to raise claims of trial error . . . . The purpose of section [1172.6] is to give defendants the benefit of amended sections 188 and 189 with respect to issues not previously determined, not to provide a do-over on factual disputes that have already been resolved.' " (*People v. Farfan* (2021) 71 Cal.App.5th 942, 947.)

23.

After independent review of the record, we find no reasonably arguable factual or legal issues exist.

## DISPOSITION

The trial court's order of December 4, 2024, denying defendant's section 1172.6 petition for resentencing, is affirmed.